In re David Lamar FAULKNER, James Larkin Toler, Spencer Hayward Blain, Jr., Paul Arlin Jensen, Kenneth Earl Cansler, and Paul Douglas Tannehill, Petitioners.

No. 88–1652.

United States Court of Appeals, Fifth Circuit.

Sept. 16, 1988.

Michael S. Fawer, Herbert W. Larson, Jr., New Orleans, La., Paul E. Coggins, Davis, Meadow, Owens, Collier & Zachry, Charyl Wattley, Dallas, Tex., for James Larkin Toler.

Michael Tigar, Austin, Tex., Phil Burleson, Sr., Burleson, Pate & Gibson, Dallas, Tex., for Davis Lamar Furniture.

Dan C. Guthries, Jr., Dallas, Tex., for Kenneth Earl Cansler.

Terry R. Ray, Dallas, Tex., for Arthur Formann.

Richard Haynes, Haynes & Fullenweider, Randall B. Wilhite, Houston, Tex., for Paul Arlin Jensen.

William M. Ravkind, Deborah Goodall, Dallas, Tex., for Spencer Hayward Blain, Jr.

A. Joe Fish, U.S. Dist. Judge, Dallas, Tex., for respondents.

Marvin Collins, U.S. Atty., Terence J. Hart, Joseph M. Revesz, Dallas, Tex., for U.S.

Before GEE, POLITZ and SMITH, Circuit Judges.

PER CURIAM:

We are presented with a petition for writ of mandamus directing the district judge to recuse himself in this criminal proceeding. Concluding that under *Liljeberg v. Health Services Acquisition Corp.*, — U.S. —, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), recusal is required, we grant the petition.

I.

The petitioners are charged, in an eighty-eight-count indictment, with conspiracy to misapply monies and funds of institutions insured by the Federal Savings & Loan Insurance Corporation (FSLIC); to defraud the Federal Home Loan Bank Board (FHLBB); to commit wire fraud; wilfully to overvalue land for the purpose of influencing actions of the FHLBB; knowingly to transport in interstate commerce money in excess of $5,000 knowing the same to have been taken by fraud; and to obstruct the activities of the FHLBB in its supervision and examination functions. Additionally, some of the petitioners are charged with a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO).

Essentially, the government charges that through land transactions primarily along the Interstate Highway 30 corridor near Dallas, Texas ("the I-30 corridor"), the petitioners unlawfully manipulated the real estate market and exploited the lending practices of federally-insured institutions, all for purposes of self-enrichment.

II.

The petition recites the facts as follows:

Mrs. Mary Pick is the first cousin of the district judge to whom this case was assigned, the Honorable Joe Fish. Both Mrs. Pick and Judge Fish describe their relationship as more like that of "brother and sister"; she is the godmother to one of his children.

In the indictment, the government alleges that in effecting their scheme, petitioners Faulkner and Toler would purchase large tracts of property at fair market value. They then would sell the tracts through a "series of sham land transactions," resulting in the ultimate sale of a less-than-five-acre tract to "borrowers" (who would receive cash payments of "up-front money") at a fraudulently-inflated price. These smaller tracts were purchased by the "borrower" for the development of condominium projects. The funding for the purchase would have been prearranged by petitioners.

The transaction in which Mrs. Pick was involved had the same components. The Wood Creek property, situated along I–30, was originally owned by petitioner Faulkner. A portion of that property was purchased by Charles Griffith in June 1982 and subsequently subdivided into two-acre parcels. The property was appraised by petitioner Paul Tannehill. In January 1983, Crested Properties was formed by Mrs. Pick, its president, to purchase one of those parcels and to be the conduit for development of the condominiums. Empire Savings and Loan Association ("Empire"), the association for which petitioner Spencer Blain served as Chairman of the Board, funded the acquisition and construction loans. The shareholders of Crested Properties (the Picks and Dr. Newman) received cash proceeds from those loans equivalent to the "up-front" money alleged in the indictment.

The indictment alleges that the petitioners caused five named savings and loan institutions to make improper and imprudent loans funding the land transactions. It is alleged that the loans required no down payments from the borrowers, provided sufficient funds to pay all fees and six months of loan interest, and provided extra funds that were paid to the borrowers.

Crested Properties borrowed several million dollars from Empire, one of the named institutions. No down payment was required of the Crested Properties investors. The loan proceeds funded all fees and an interest reserve fund. Additionally, the investors received a check from the remaining proceeds of approximately $20,000.

In late December 1982, Mary Pick and her husband, Sanford Pick, were approached by Griffith to invest in condominium development primarily along the I–30 corridor. Griffith proposed that the group invest in four projects: Wood Creek, Lake Terrace, The Brook, and Tiffany Cove.[1] He presented a written schedule that showed projected profits of $5–13,000 per unit. The investors would be required to pay only $2,000 each to their corporation, to be used for corporate expenses.

Following the presentation by Griffith, Mrs. Pick undertook her own evaluation of the proposal.[2] She evaluated the projected profits by reviewing comparable sales data from the sales of Faulkner Point units; she personally inspected each site. Based upon her evaluation, a decision was made to proceed with the proposed investment through Crested Properties.

In January 1983, Crested Properties closed on the purchase of The Brook. Empire funded the purchase price of $430,000, which was secured by a lien on the real estate and by the personal guarantees of Drs. Pick, Newman, and Mills. Mrs. Pick, as a licensed real estate broker, required the payment of a percentage commission to her personally on each of the projects.

---

1. The government has identified The Brook and Wood Creek as "developments relevant to the conspiracy counts."

2. During his presentation, Griffith told the Picks, Dr. Newman, and Dr. Mills that he had "received the mantle of blessing from Danny Faulkner" to proceed with the condominium development. He also told them that the development of the I–30 corridor was to be done in a staggered and controlled fashion, as planned by Faulkner. Mrs. Pick was aware of Faulkner's reputation as a builder.

In March 1983, Crested Properties closed on Wood Creek.[3] Crested Properties received a payment from the proceeds of that closing in the amount of $21,000.

Mrs. Pick also became involved in the marketing of the end units. A corporation, Coffer Sales, was established with Mrs. Pick as president. She received a monthly salary of $4,000. In addition, Coffer Sales paid a percentage of the rent and office expenses of Mary Pick Realty, Inc. During the time that she was actively involved in the I-30 project, Mrs. Pick would discuss with family members, including Judge Fish, the various activities in which she was involved and would recount the day-to-day events.

In July 1983, Mrs. Pick concluded that there were significant problems with the organization with which she had been involved. She obtained information that led her to conclude that Griffith probably had, in her opinion, committed unlawful activities, including misappropriation of funds. In September 1983, she decided to resign from the sales company and focus her efforts upon protecting the interests of Dr. Pick, Dr. Newman, and herself.

As part of those efforts, Mrs. Pick obtained only one paragraph of a full appraisal of the Wood Creek II property that had been prepared by petitioner Tannehill. Mrs. Pick took that paragraph to an appraiser, who advised her that, in his opinion, the appraised value was too high. The appraiser, however, could not evaluate the comparison data used by Tannehill because the information had not been obtained by Mrs. Pick. Nonetheless, based upon the appraiser's statements, Mrs. Pick concluded that the appraisal of the Wood Creek property was false and fraudulent.

During this same time period, newspaper articles were being published concerning condominium development along the I-30 corridor. A representative of Coffer Companies mailed copies of those articles to various shareholders, including Mrs. Pick.

Crested Properties had made a loan with Empire for Wood Creek in the spring of 1983. The Picks and Dr. Newman were released from the guarantees of that liability. Mrs. Pick obtained those releases after she had become personally convinced that illegal conduct was involved on the part of Griffith and suspected that there might even be a misappropriation of funds. She obtained the releases by refusing to sign as president of Crested Properties on The Brook construction loan application until the releases were obtained.

In January 1984, Mrs. Pick signed, as president of Crested Properties, for a $1,992,800 construction loan for The Brook from Empire which, not having been advised of Mrs. Pick's suspicions, funded the $1,992,800 construction loan for The Brook on the personal guarantee of Griffith and Dr. Mills. Neither the Picks nor Dr. Newman guaranteed this loan. It is this action that caused the issuance of the releases of liability on Wood Creek.

After Empire ceased operations, FSLIC, acting as receiver, reached a settlement agreement with the Picks with respect to the March 2, 1983, loan on the Wood Creek II Condominiums. However, on November 26, 1985, the Picks, along with numerous other individuals, were named by FSLIC in a civil RICO lawsuit.[4]

That complaint received significant media attention. Mrs. Pick clearly recalls that her irritation and anger regarding the newspaper article on that lawsuit were shared with family members, again includ-

---

3. The property that became Wood Creek II was originally owned by petitioner Faulkner and his children and was sold to Griffith in June 1982. On November 1, 1983, Mrs. Pick directly conveyed to Faulkner and his children approximately .04 acres of this tract that had been retained by the Faulkners for the construction of a billboard.

4. Mrs. Pick and her husband have been named as defendants in *FSLIC as Receiver for Empire*

*Savings & Loan Assoc. v. D.L. Faulkner, et al.,* No. CA3-85-2360G, and *Northlake Fed. Sav. & Loan Assoc. v. Charles Griffith, et al.,* No. CA3-84-1135H. By an Order entered June 28, 1988, United States District Judge Maloney stayed any proceedings in this case based upon the pendency of the instant criminal case. Judge Fish voluntarily recused himself from presiding over the Northlake suit.

ing Judge Fish. In her mind, that article, by the very listing of the named defendants, created the unmistakable impression that all persons named were engaged in criminal conduct. To that inference Mrs. Pick took understandable exception.[5]

### III.

Petitioners seek a writ of mandamus from Judge Fish's denial of their motion to disqualify him. The motion was made pursuant to 28 U.S.C. § 455.[6] Judge Fish denied the original motion on March 10, 1988 (denying reconsideration on April 13, 1988), and denied a supplemental motion on September 2, 1988.

In his memorandum order of March 10, Judge Fish notes that (much to his credit, in our opinion) he raised the issue of disqualification *sua sponte* after seeing Mrs. Pick's name on a document index; he permitted petitioners to take Mrs. Pick's deposition. Properly, the judge noted in his opinion that to require disqualification, "the alleged bias must stem from an extrajudicial source rather than what the judge learned from participating in the case or a related case. *United States v. Phillips*, 664 F.2d 971, 1002–03 (5th Cir.1981), *cert. denied*, 457 U.S. 1136 [102 S.Ct. 2965, 73 L.Ed.2d 1354] (1982), 459 U.S. 906 [103 S.Ct. 208, 74 L.Ed.2d 166] (1982). . . ." Also correctly, Judge Fish opined that "[t]his motion should be decided by considering how my participation would look to the average person in the street" (citing *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir.), *cert. denied*, 449

U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980)). He concluded that to the average person, there would be no impression of partiality.

### IV.

■ We conclude that Judge Fish enunciated the proper standard but applied it erroneously to the facts and circumstances of this case. As pertinent here, section 455 requires disqualification as follows:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . .

Most recently, we were reminded by the Supreme Court of the strictness with which section 455 is to be applied. In *Liljeberg v. Health Services Acquisition Corp.*, —— U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855 the Court reiterated that the view of the average, reasonable person is the standard for analysis as to whether a judge shall disqualify himself or herself.

In *Liljeberg*, the Court noted that disqualification "does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." 108 S.Ct. at 2202. Affirming and quoting from an opinion by

---

**5.** Mrs. Pick called Judge Fish when her name appeared in the newspaper article concerning the possible conflict in this case. She further informed Judge Fish, at church, that her deposition was being taken. She has described her view of the I–30 situation as a "mess." She has further acknowledged that her distress regarding her problems resulting from the I–30 corridor transactions may have been conveyed to Judge Fish as well as other family members. She has certainly shared with family members her opinion that Griffith is a "fraud."

**6.** As discussed *infra*, § 455 calls for disqualification not primarily for actual bias, but where certain enumerated circumstances exist. In the district court, the motion for disqualification

was pursuant to § 455; no mention was made of 28 U.S.C. § 144, which relates only to charges of actual bias. However, in their petition to this court, petitioners make mention of § 144 and allege bias on the basis of certain statements by Judge Fish at the sentencing hearing in a related case. We find that assertion of bias spurious and reject it out-of-hand. Our review of the portions of the record that are available to us now reveals no indication of actual bias or prejudice on the part of Judge Fish in regard to this case. Our conclusion that the writ should issue is based upon factors other than actual bias, such as the appearance of partiality, and is in no way a reflection upon Judge Fish's ability to preside over this case evenhandedly.

Chief Judge Clark of this court,[7] the Court reasoned as follows:

> 'The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible.... Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge.'

*Id.* Thus, if a judge "concludes that 'his impartiality might reasonably be questioned,' then he should also find that the statute has been violated." *Id.*

Significantly, the Court suggests that although the view of the "reasonable person" may not always be fair or even accurate, it is still the standard that must be applied: "[P]eople who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Id.* 108 S.Ct. at 2204–05.

## V.

■ Under the Supreme Court's compelling standard, we conclude that Judge Fish must stand down from this case, despite the total absence of any showing of actual bias. Under the facts presented, it is patent that "his partiality might reasonably be questioned" by a reasonable observer. This disqualifies him under section 455(a). Even were this not so, he has, at least

through his personal conversations with Mrs. Pick, "personal knowledge of disputed evidentiary facts concerning the proceeding" sufficient to disqualify him, under section 455(b)(1), from presiding further over this case.

The facts speak for themselves, and our detailed analysis of them would be superfluous. In summary, a relative with a close relationship to the judge has been an important participant in key transactions forming the basis of an indictment.[8] Perhaps even more importantly, that relative has communicated to the judge, substantially though maybe not extensively or in great detail, material facts and her opinions and attitudes regarding those facts.

A reasonable person easily could question the judge's impartiality, given these circumstances. The Supreme Court's standard is strict, but the result is salutary. As the Court stated in *Liljeberg,*

> '... We make clear that we are not required to decide whether in fact [the judge] was influenced, but only whether sitting on the case ... " 'would offer a possible temptation to the average [judge] ... [to] lead him not to hold the balance nice, clear and true.' " The Due Process Clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.' " '

108 S.Ct. at 2205 (quoting *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986)).

The petition is GRANTED; the writ shall issue. So ordered.

---

7. *Health Serv. Acquisition Corp. v. Liljeberg,* 796 F.2d 796, 802 (5th Cir.1986), *aff'd,* — U.S. —, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).

8. There appears to be a substantial possibility that she will appear as a trial witness in this case.