**UNITED STATES of America, Plaintiff–Appellee,**

v.

**H. Wailen YORK, Defendant–Appellant.**

**No. 88–1386.**

United States Court of Appeals, Fifth Circuit.

Nov. 9, 1989.

Rehearing Denied Dec. 11, 1989.

John B. Holden, Jr., and Kari J. Sperstad–McElyea and Gary A. Udashen, Co–Counsel, Dallas, Tex. (Court-appointed), for defendant-appellant.

Andrew Levchuk, Appellate Section, Crim. Div., Douglas P. Lobel, Fraud Section, Crim. Div., Attys., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

H. Wailen York was charged with a wide variety of criminal acts, ranging from wire fraud to making false statements to federally insured lending institutions. York was involved in the so-called "I–30" condominium matter,[1] and the charges against him

---

1. The scheme involved land developments along the Interstate Highway 30 corridor near Dallas, Texas. The scheme apparently worked generally as follows: The principals, Faulkner and Toller, purchased large tracts of land along the I–30 corridor at fair market value (i.e., cheaply) and then, through a series of sham transactions and subdivisions, artificially increased property values. Faulkner and Toller then procured loans and brought in investors on the basis of these inflated prices. *See In re Faulkner,* 856 F.2d 716, 717–18 (5th Cir.1988) (per curiam).

arose from his efforts to obtain financing for his real estate deals. After a two-week jury trial, York was convicted on 17 of 20 counts and sentenced to 35 years in prison.[2]

York appeals on four grounds. First, he asserts that he was denied a fair trial because the trial judge, the Honorable A. Joe Fish, did not recuse himself despite a personal interest in the case. Second, York contends that the trial court erred in admitting into evidence a large check and allusions to York's possible involvement in money-laundering and land-flipping schemes. Third, York claims that on two of the counts, 9 and 10, the government failed to meet its burden of proof in showing that prosecution of the criminal acts was not barred by the statute of limitations. Finally, York argues that his simultaneous convictions under sections 1001 and 1014 violate the double jeopardy clause. We affirm on all issues except the limitations question, on which we reverse.

I.

The focal point of York's appeal is his contention that Judge Fish should have recused himself. Judge Fish's cousin, Mary Pick, was an investor in the I–30 fiasco. She was named as a defendant in a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") suit arising from the scandal and was deposed in another suit related to the I–30 scheme. In addition, a Dallas newspaper had named Mrs. Pick as a party involved in the I–30 fraud.

Judge Fish and Mrs. Pick have a close relationship, one that they describe as "brother-sister." In the depositions taken in *In re Faulkner*, Mrs. Pick admitted that she had conversations with Judge Fish about the I–30 matter in general and about her outrage over the I–30 "mess." Neither York nor the government has established whether Judge Fish and Mrs. Pick had any conversations regarding either York or the issues unique to the instant case.

In *Faulkner*, which also arose from the I–30 deals, Judge Fish had informed the litigants of his relationship with Mrs. Pick and allowed them to conduct discovery on the issue of whether he should recuse himself. When Judge Fish eventually denied the disqualification motions, the parties successfully sought a writ of mandamus from this court.

York cited the *Faulkner* proceedings in his pretrial motion for dismissal of certain counts of the indictment. Moreover, at oral argument before this court, York's counsel acknowledged that "they [York's trial attorneys] were aware of the *Faulkner* proceedings, so there is not an issue as to that." This response was in answer to questions regarding the recusal issue. Therefore, even though York was aware of possible grounds for recusal, he never moved to disqualify Judge Fish before or during the trial. York defends his inaction by arguing that Judge Fish would have viewed the motion as frivolous because Judge Fish had declined to recuse himself in *Faulkner*.

On September 16, 1988, we ruled on the mandamus action, directing Judge Fish to recuse in *Faulkner*. However, York did not make a post-trial motion to disqualify Judge Fish. Instead, he raises the recusal issue for the first time on appeal. The government responds that the issue is not properly before us because York failed to raise it in the district court.

The government's brief appears to have caused a mental sunrise for York: On May 15, 1989, after receiving the government's brief, but before filing his reply brief, York finally filed a motion for new trial in the

---

**2.** The convictions were for wire fraud, in violation of 18 U.S.C. § 1343 (counts 2–4); knowingly making false statements in connection with loan applications to federally insured financial institutions, in violation of 18 U.S.C. § 1014 (counts 5, 7, 9, 11, 15, 17, and 19); and of using false and misleading documents in connection with financial transactions with entities under the jurisdiction of United States agencies and departments, in violation of 18 U.S.C. § 1001 (counts 6, 8, 10, 12, 16, 18, 20). The court sentenced York to consecutive five-year terms on counts 6, 8, 10, 12, 16, 18 and 20; to two-year terms on counts 5, 7, 9, 11, 15, 17 and 19, with these sentences to run concurrently with each other and with the sentences imposed on counts 6, 8, 10, 12, 16, 18 and 20; and to five years' probation on counts 2, 3, and 4 (sentence suspended). Fines of $108,000 and restitution of $500,000 were also assessed.

district court, asserting that our decision in *Faulkner* and a letter which Judge Fish sent to the *Faulkner* panel[3] constitute newly-discovered evidence on the recusal issue, warranting a new trial. This motion came over a year after the trial and long after York was aware of facts that might warrant a recusal. On June 26, 1989, District Judge Barefoot Sanders heard and denied, without opinion, York's motion. We now consider this eleventh-hour (or, perhaps more properly, thirteenth-hour) motion to disqualify Judge Fish, brought in the guise of a motion for new trial, as well as the other points of error raised by defendant.

## II.

■ We first address whether York's motion for a new trial was timely. No explicit timeliness requirement can be found in the language of 28 U.S.C. § 455.[4] The current provision, drafted in 1974, incorporated material from section 144 of that title as well as parts of former section 455. Substantively, the modern sections 144 (motions for disqualification) and 455 (duty of judge to recuse himself) are "quite similar, if not identical." *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) (citations omitted).[5]

■ Section 144 has an explicit timeliness requirement, while the old section 455 did not. Some commentators have argued that the absence of a timeliness requirement in the current version of section 455

is indicative of congressional intent; others have asserted that Congress did not feel a need to include a timeliness requirement, as it was understood that the "judicial gloss" on the former section 455 would be preserved and that a timeliness requirement was implicit. *See Delesdernier v. Porterie*, 666 F.2d 116, 121 (5th Cir.), *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982).

In *Delesdernier*, we recognized this ambiguity in the statute, noted how other circuits had approached the issue, weighed relevant policy considerations, and concluded that a timeliness requirement should apply to section 455(a). *See id.* at 121–23. The rationale and justification for our decision in *Delesdernier* are adequately set forth therein, and we need not repeat them. In *Delesdernier*, though, we explicitly declined to decide whether a timeliness requirement was appropriate under section 455(b), since the motion in *Delesdernier* was brought only under section 455(a). *See id.* at 122 n. 3.

Section 455(a), which addresses appearances of impropriety, may be waived by the litigants if the judge fully and fairly apprises the parties of the reasons for the appearance of impropriety. Section 455(b), which addresses actual bias or conflict of interest on the part of the judge, is non-waivable. The policy argument in favor of instituting a timeliness requirement is the same for each section—namely, to prevent litigants from wasting valuable court resources by proceeding through a long trial, knowing all the time that there are

3. The letter criticized the panel's ruling. The panel treated it as a petition for rehearing and summarily denied it.

4. Section 455 provides, in pertinent part, as follows:

   (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

   (b) He shall also disqualify himself in the following circumstances:

   (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

   (e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

5. Hereinafter we use the shorthand terms "455 motion" and "disqualification motion" for motions asking for a new trial, reconsideration, or amendment of a judgment based upon an alleged violation of § 455. A recusal motion *per se* is proper only under § 144. In the instant case, no § 144 motion is before us.

grounds for recusal but waiting until the end of trial to make the section 455 motion should they lose.

Thus, any difference to be divined between the timeliness requirements of sections 455(a) and 455(b), it seems, must hinge either on the distinction of waivability or on some greater interest in protecting against actual bias as opposed to mere appearance of impropriety. In *Delesdernier*, we took brief notice of the waivability distinction before electing not to decide whether section 455(b) includes a timeliness requirement:

> One commentator has argued that a distinction should be drawn between 455(a) and 455(b) with respect to timeliness. Note, *Disqualification of [Federal Judges for Bias or Prejudice*, 46 U.Chi.L.Rev. 236, 265 (1978).] Grounds for disqualification under 455(a) permit a waiver after full disclosure of all relevant facts, while grounds under 455(b) do

not. This might suggest that arguments for timeliness under 455(b) have less force, or at least that a requirement of timeliness under 455(b) should be less stringent than one under 455(a). However, we note that both [*United States v. Conforte*, 624 F.2d 869 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980), and *In Re International Business Machs. Corp.*, 618 F.2d 923 (2d Cir.1980),] involved motions for disqualification under 455(b) (*Conforte* involved a motion under 455(a) as well), and in both these cases the 455(b) motions were held untimely. Because Delesdernier only raised a motion for disqualification under 455(a) as an issue, we need not decide if considerations of timeliness would be different under 455(b).

*Id.* at 122 n. 3.[6]

In assessing whether the arguments for a timeliness requirement have sufficient

---

**6.** In fact, most of the circuits have both imposed some timeliness requirement under § 455 and have not distinguished between subsections (a) and (b) for purposes of timeliness. For example, the Eighth and Tenth Circuits treated §§ 455(a) and 455(b) identically when the issue of timeliness arose. *See Oglala Sioux Tribe v. Homestake Mining Co.*, 722 F.2d 1407, 1414 (8th Cir.1983); *Willner v. University of Kan.*, 848 F.2d 1020, 1022–23 (10th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989). The Federal Circuit, although holding that the "timeliness" requirement of § 455 was addressed to the inequity rather than length of a delay, explicitly rejected any distinction between subsections (a) and (b). *Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1420–21 (Fed.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 1956, 104 L.Ed.2d 425 (1989). The Ninth and Second Circuits have not expressly held that § 455(b) motions must be timely; they have, however, imposed a timeliness requirement for § 455, without distinguishing between subsections (a) and (b). *See United States v. Conforte*, 624 F.2d 869, 880 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *In re International Business Machs. Corp.*, 618 F.2d 923, 932 (2d Cir.1980). Likewise, we have discussed the timeliness requirement in general terms, without regard for the distinction we suggested in *Delesdernier*. *See, e.g., Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir.1986), *aff'd*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d at 1164 n. 3.

The Seventh and Eleventh Circuits have reached more equivocal results. In *SCA Servs., Inc. v. Morgan*, 557 F.2d 110, 117 (7th Cir.1977),

the court rejected a timeliness requirement for any portion of § 455. This decision, though, has since been questioned in *United States v. Murphy*, 768 F.2d 1518, 1539 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986), and *Union Carbide Corp. v. U.S. Cutting Service, Inc.*, 782 F.2d 710, 716 (7th Cir.1986). In *Murphy*, however, the court noted that § 455(a) deals only with appearances, whereas § 455(b) protects substantial personal rights, and that appearance questions are generally waived if not timely asserted. 768 F.2d at 1540. In *United States v. Slay*, 714 F.2d 1093, 1094–95 (11th Cir.1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984), the court held that § 455(a) motions must be timely; however, after disposing of the appellant's § 455(a) claim as untimely, the court addressed the merits of his § 455(b) claim. *Id.* Thus, although the court did not expressly distinguish between the two provisions, its treatment of the two claims indicates that it may not require § 455(b) claims to be timely. The court in fact stated in a subsequent case, *United States v. Alabama*, 828 F.2d 1532, 1544 n. 49 (11th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988), that *Slay* did indeed distinguish between subsections (a) and (b). The court in *Alabama* found that the delay in that case was not an abuse of process or a case of dilatory tactics and concluded that, regardless of whether § 455(a) had a timeliness requirement, the recusal motion was not untimely. Thus the Seventh and Eleventh Circuits have suggested a distinction between §§ 455(a) and 455(b) for purposes of timeliness but have not based holdings upon express differentiations.

force, we observe that waiver and timeliness are distinct issues. The proscription against waiver in section 455(e) prohibits the parties from agreeing to relinquish their right to have the judge recuse himself if that recusal should be based upon section 455(b) grounds; in other words, section 455(e) prohibits the judge and the parties from agreeing among themselves to abrogate section 455(b).

Timeliness is a different issue. A timeliness requirement forces the parties to raise the disqualification issue at a reasonable time in the litigation. It prohibits knowing concealment of an ethical issue for strategic purposes.[7]

We acknowledge that it is preferable to avoid appearances of impropriety wherever possible. However, the waiver provision in section 455(e) relating to section 455(a) is justified by concern for judicial economy. The fact that section 455(b) is non-waivable suggests that Congress believed the gain in protecting against actual bias, prejudice, or conflict of interest outweighs the loss to judicial economy in prohibiting waivers.

The motivation behind a timeliness requirement is also to a large extent one of judicial economy: A timeliness requirement under section 455(b) serves to protect against the same ploys as under section 455(a). However, the gains in judicial economy from a timeliness requirement are greater than those from permitting waiver. Since both parties must agree to any waiver, no new trial will be saved by waiver once the outcome of trial has been determined. In fact, once any party senses that the proceedings have been favorable to it up to that point, no waiver is likely to occur. On the other hand, a timeliness requirement will proscribe motions that would have invalidated a fully completed trial.

Moreover, a timeliness requirement has an additional dimension: Prohibiting waiver may cost time and effort, but it is neutral with respect to expected outcome of the case, as any waiver that would have occurred but for the prohibition would have been one to which both parties had agreed. Lack of a timeliness requirement, though, would allow the losing party an increased chance of a new trial.[8] Thus, policy reasons supporting a timeliness requirement appear to be stronger than those supporting a waiver option. Hence, we conclude that it is more consistent with the legislative purposes underlying the entirety of section 455 for us to construe both subsections (a) and (b) as requiring timeliness.

■ We now consider whether York's motions under sections 455(a) and 455(b) were untimely. We have hinted at the possibility of a rigid application of the timeliness requirement. In *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1096 n. 3 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 328 (1988), we held a recusal motion "waived" when it was raised for the first time on appeal. We need not determine, however, whether the same should be adopted as an inflexible rule. Moreover, the Supreme Court at least implicitly has rejected the notion that any disqualification

---

7. Imposing a timeliness requirement on § 455(b) motions does not render the § 455(e) distinction on waiver a nullity. Although a waiver would not be valid until the parties are fully informed of the potential grounds for recusal, and the timeliness of a motion for disqualification would be based upon the elapsed time since the litigants became aware of those grounds of recusal, timeliness does not necessarily require that a motion for disqualification be filed *immediately* upon learning of the grounds for disqualification. Therefore, even with a timeliness requirement for § 455(b), there would still exist a time within which the waiver distinction of § 455(e) would have actual effect. That is to say, after being informed of the grounds for recusal but before the motion becomes untimely, the court and the litigants could waive the § 455(a) restrictions but not those under § 455(b). Then, during the period after this waiver became effective but before the motion became untimely, a motion for disqualification could be entertained under § 455(b) but not under § 455(a).

8. A rule that permits the losing party at trial an increased chance for a new trial may not have any *inherent* effect upon either party's initial chance of ultimately prevailing, but such a rule definitely adds costs and reduces the initial chance of ultimately prevailing of a party that, unlike its opponent, is unaware of the grounds for disqualification.

motion made after the close of trial should be deemed *per se* untimely. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 2203–04, 100 L.Ed.2d 855 (1988). The Court held that under Fed.R.Civ.P. 60(b)(6), a recusal motion could be brought within a "reasonable time" after final judgment, under certain circumstances.

We may decide the case before us under its facts without employing a *per se* rule. In summary, York, dissatisfied with the results of his first trial, seeks another, this time with a different judge. Yet before his trial began, York was aware generally of the circumstances upon which he bases his motion for disqualification. York allowed the court to conduct a full trial, all the while knowing that he might seek to invalidate it. Therefore, we find his motion for a new trial untimely.

We acknowledge that some courts will review a motion for disqualification for the first time on appeal under a plain-error rule, even if the parties did not raise the matter in the district court. *See, e.g., United States v. Schreiber*, 599 F.2d 534, 535–36 (3d Cir.), *cert. denied*, 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979); *cf. Conforte*, 624 F.2d at 880 ("[W]e leave open here the question whether timeliness may be disregarded in exceptional circumstances."). In *Stephenson*, 839 F.2d at 1096 n. 3, we suggested that we will not entertain such a question raised for the first time on appeal.

Moreover, York does not establish plain error in this case. Courts that have applied a "plain error" test have made it a stringent one. When a criminal defendant raises section 455 for the first time on appeal, he bears a "heavier [burden] than under the accepted standard [abuse of discretion] for reviewing judicial disqualifications when the claim has first been presented in the district court." *Schreiber*, 599 F.2d at 536 (citations omitted). In general, reversal for "plain error" requires a showing of "particularly egregious errors" resulting in a "miscarriage of justice." *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted). Judge Fish's cousin, Mary Pick, had a much more attenuated connection to York than to Faulkner. Thus, even if we were to review for plain error, it seems unlikely that we would find it.[9]

## III.

■ York contends that the district court abused its discretion by admitting into evidence a $1,025,623.81 check received by York from Faulkner and by permitting suggestions by the prosecutor, in regard to the check, that York may have been involved with Faulkner in money-laundering or land-flipping schemes. York claims that these matters constitute impermissible character evidence. However, under Fed. R.Evid. 404(b), extrinsic evidence of other crimes, wrongs, or acts is admissible to prove, among other things, motive, intent, plan, or knowledge. The decision to admit extrinsic evidence under rule 404(b) is within the discretion of the trial judge, and we will reverse only for an abuse of that court's discretion in weighing the probative value of the evidence against its prejudicial effect. *See United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir.1986).

The check at issue is probative to show knowledge, an element under sections 1001 and 1014. At several points in York's testimony, he suggested he was not aware of

---

9. York also asserts that his due process rights have been violated by Judge Fish's failure to recuse. But York fails to explain the basis for this constitutional argument. Moreover, the grounds for disqualification in this case are the same as those which the Supreme Court has found not to implicate constitutional concerns. York contends that Judge Fish should have recused himself because of his relationship with Mrs. Pick and because of the personal bias and knowledge which he obtained through that relationship. However, the Supreme Court has "recognized that not '[a]ll questions of judicial qualification ... involve constitutional validity. Thus matters of *kinship, personal bias,* state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.'" *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823 (1986) (emphasis added) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927)).

the details of certain transactions and implied that Faulkner was really the key player and decisionmaker in the projects' financing. To the extent that York was putting forth evidence supporting his lack of knowledge with regard to certain false statements, the fact that York was paid more than $1,000,000 by Faulkner (over half of which he deposited directly into his own account) serves to rebut any suggestion that he was merely a small-time participant or a pawn in a scheme orchestrated entirely by Faulkner.

York's large share of the profits militates against his being ignorant of important financial data related to the projects. Admittedly, York at trial did not strongly assert dependence or reliance upon Faulkner (close association with one facing a notorious indictment would probably have been a poor trial strategy), but we still find that the check and related statements were probative to show York's significant status in his partnership with Faulkner.

As York notes, there is nothing inherently unlawful about receiving a check, and no extrinsic evidence actually demonstrating land-flipping or money-laundering was presented. The admission of the check thus had limited prejudicial effect. Therefore, we find that the trial court did not abuse its discretion in admitting the evidence.

### IV.

■ York argues that the government failed to provide sufficient evidence by which a jury could find that the defendant committed two of the offenses within the five-year limitations period set by 18 U.S.C. § 3282. The government has the burden of proving that York committed the offenses within the limitations period. *See Grunewald v. United States*, 353 U.S. 391, 396–97, 77 S.Ct. 963, 969–70, 1 L.Ed.2d 931

(1957); *Az Din v. United States*, 232 F.2d 283, 287 (9th Cir.1956).[10]

York was indicted on September 16, 1987, and hence could be prosecuted under section 1001 or 1014 for acts occurring on or after September 16, 1982. On October 1, 1982, Lancaster First Federal Savings and Loan Association approved York's loan application based upon his March 15, 1982, financial statement, on which the jury found York had falsified information.

York was charged with submitting false financial statements; hence, the crime was completed at the time of the submission of the loan application, not at the time of the application's approval by the financial institution. At trial, the government could not produce York's loan application and adduced no evidence whatsoever to show that it was, for example, standard practice at Lancaster Savings and Loan to approve or deny loan applications within 15 days of their submission.

Therefore, there was no evidence from which a jury could conclude that the application was submitted between September 16, 1982, and October 1, 1982, rather than between March 15, 1982, and September 15, 1982. Thus, the evidence is insufficient to satisfy even a preponderance standard, so we need not give any further consideration to the degree of the government's burden.

The government claims that the actual submission date is irrelevant, because York violated section 1014 at the closing on October 1, 1982, by reaffirming his false statements. But York was charged not with this separate offense under section 1014, but only with *submitting* false financial statements. Therefore, we reverse defendant's convictions on counts 9 and 10.

### V.

■ York also claims that his convictions and sentencing under sections 1001 and

---

**10.** Although it does not appear to be established with certainty, most of the prevailing authority suggests that commission of the crime within the limitations period of § 3282 is an essential element of the offense which the government must prove beyond a reasonable doubt. *See Jhirad v. Ferrandina*, 536 F.2d 478, 84–85 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); *Cf. Az Din*, 232 F.2d at 287 (citing *Buhler v. United States*, 33 F.2d 382 (9th Cir.1929), which imposes a reasonable-doubt burden, *see id.* at 385); *Grunewald*, 353 U.S. at 412–13, 77 S.Ct. at 977–78.

1014 violate the double jeopardy clause of the fifth amendment, which " 'protects against a second prosecution for the same offense after acquittal ...[,] against a second prosecution for the offense after conviction[, and] against multiple punishments for the same offense.' " *Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted)).

It is the latter prohibition against "multiple punishments for the same offense" that defendant asserts has been violated. However, the Supreme Court has held that "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution." *Albernaz, id.* 450 U.S. at 344, 101 S.Ct. at 1145 (footnotes omitted).

In order to determine whether Congress intended to authorize multiple punishments under violations of two different statutes for the same criminal act, "our starting point must be the language of the statutes. Absent a 'clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Albernaz, id.* at 336, 101 S.Ct. at 1141 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

The Supreme Court has directed us to apply the *Blockburger* rule of statutory construction to the language:

> In *Whalen* [*v. United States*], the Court explained that the 'rule of statutory construction' stated in *Blockburger* is to be used 'to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively.' 445 U.S. [684], at 691, 100 S.Ct. [1432], at 1437, 63 L.Ed.2d 715 [1980]. The Court then referenced the following test set forth in *Blockburger:*
>
> > The applicable rule is that where the same act or transaction constitutes a

violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Blockburger v. United States, supra,* 284 U.S. [299] at 304, 52 S.Ct. [180] at 182 [76 L.Ed. 306 (1932) ].

*Albernaz, id.* at 337, 101 S.Ct. at 1141. The Court cautions, however, that "[t]he *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." *Albernaz, id.* at 340, 101 S.Ct. at 1143. In *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983), the Court stated,

> Our analysis and reasoning in *Whalen* and *Albernaz* lead inescapably to the conclusion that simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* is not a constitutional rule requiring courts to negate clearly expressed legislative intent.

From the statutes' language, section 1014 has an additional element not in section 1001: Namely, section 1014 requires intent to influence a *financial institution*, not merely any government agency. Then if section 1001 has some element not contained in section 1014, *Blockburger* is satisfied. If, on the other hand, all of section 1001's elements are in section 1014, then we still conclude that the sentencing provisions strongly suggest congressional intent to allow cumulative sentences under the two offenses; for if every section 1014 violation encompasses a section 1001 violation, and yet a court cannot aggregate the sentences, then there would be no purpose in ever bringing a section 1014 indictment, since a section 1001 charge would always be easier to prove and carries a higher

maximum sentence (five years rather than two years). It would also be unusual for Congress to assign one offense as a lesser included offense of another and yet not permit any greater punishment for the second offense.

Moreover, the legislative intent here is evident, for the two statutes are directed at different ends, which is a relevant factor in determining congressional intent. *See Albernaz*, 450 U.S. at 339, 101 S.Ct. at 1142. Congressional intent in enacting section 1001 was "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Rodgers*, 466 U.S. 475, 480, 104 S.Ct. 1942, 1947, 80 L.Ed.2d 492 (1984) (quoting from *United States v. Gilliland*, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941)). Section 1014, on the other hand, "was intended to maintain the vitality of the FDIC insurance program, *United States v. Bush*, 599 F.2d 72, 75 (5th Cir.1979), and 'to cover all undertakings which might subject the FDIC insured bank to risk of loss.' *United States v. Stoddart*, 574 F.2d 1050, 1053 (10th Cir.1978)." *United States v. Pinto*, 646 F.2d 833, 838 (3d Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 94, 70 L.Ed.2d 85 (1981).

The difference in focus of the two statutes is by no means a dramatic one, but "the earliest version of § 1001 dates back more than a century. Its original concern was to penalize those who made fraudulent monetary claims against the government." *United States v. Rose*, 570 F.2d 1358, 1363 (9th Cir.1978). Section 1014 is much newer (enacted in 1948) and directed toward extending specific protection from fraud not only to governmental entities but also to private institutions receiving certain public benefits. Section 1014 responds to the expanded role of government. Based upon the foregoing, we conclude that convictions under both sections 1001 and 1014 were proper.

The convictions on counts 2, 3, 4, 5, 6, 7, 8, 11, 12, 15, 16, 17, 18, 19, and 20 are AFFIRMED. The convictions on counts 9 and 10 are REVERSED. This matter is REMANDED to the district court for further proceedings consistent herewith.