**JARVIS CHRISTIAN COLLEGE, et al.,**
**Plaintiffs–Appellees,**

v.

**EXXON CORPORATION,**
**Defendant–Appellant.**

**Ivey Hugh RUTHERFORD, et al.,**
**Plaintiffs–Appellees,**

v.

**EXXON CORPORATION,**
**Defendant–Appellant.**

**C.M. BECKETT, Jr., et al.,**
**Plaintiffs–Appellees,**

v.

**EXXON CORPORATION,**
**Defendant–Appellant.**

No. 88–2003.

United States Court of Appeals,
Fifth Circuit.

May 10, 1988.

Jack W. Flock, Mike A. Hatchell, Tyler, Tex., David J. Beck, A. Frank Koury, Reagan Burch, Houston, Tex., for defendant-appellant.

T. John Ward, Longview, Tex., for C.M. Beckett, et al.

Robert Schleier, Glenn Phillips, Kilgore, Tex., for Rutherford, et al.

Noel Hensley, George W. Bramblett, Jr., Dallas, Tex., for Meredith Foundation, et al., Jarvis Beckett.

John C. Hardy, Tyler, Tex., Charles Rodney Acker, Barry F. Cannaday, Dallas, Tex., for Jarvis Christian College.

R. Matt Dawson, Corsicana, Tex., for Carol Dawson Hailey.

Before BROWN, and GEE, Circuit Judges.[*]

JOHN R. BROWN, Circuit Judge:

This litigation arises out of a dispute between Exxon Corporation, appellant in this court, and a number of royalty interest owners, appellees, in the Hawkins Field Unit (HFU), a crude oil producing field, located in Wood County, Texas. Exxon is the operator of the HFU and the purchaser of much of the HFU crude oil owned by the appellees. This case initially raised the question whether Judge Robert Parker of the District Court for the Eastern District of Texas, Tyler Division, erred in issuing an injunction prohibiting Exxon from proceeding in the District Court for the Southern District of Texas, Houston Division, with certain reimbursement claims against the interest owners litigating in Tyler. Following the § 1404 transfer [1] of all Houston suits to Tyler, by Chief Judge John Singleton of the Southern District, the initial question before this Court has metamorphosed into whether the Houston Court properly issued the transfer order. For the reasons that follow, Chief Judge Singleton was entitled to conclude that the interests of justice would be best, and most expeditiously, served by the consolidation of this conglomeration of litigation before the Tyler Court. We affirm.

Our story begins in Wood County, Texas, on November 3, 1980, when Jarvis Christian College, The Meredith Foundation, Norman Rutherford and Frank Morrison, Jr. (the Jarvis plaintiffs) filed suit in the District Court of Wood County, Texas, against Exxon Corporation and W.F. At-

---

[*] Judge Will Garwood participated in the oral argument, but has since recused himself from participation in this decision. The decision of the Court is being issued by a quorum. 28 U.S.C. § 46(d).

1. 28 U.S.C. § 1404.

wood (collectively "Exxon").[2] This first salvo in the war between Exxon and the interest owners had as its purpose obtaining a Temporary Restraining Order, preventing Exxon from either suspending or diverting any portion of monthly royalty payments due to the plaintiffs. And so it appears that we need a chapter before the first, to understand why these plaintiffs were seeking this relief.

### Chapter Before the First: DOE Declares War on Exxon

The plaintiffs in the Wood County suit, as well as other plaintiffs who will shortly be introduced, are owners of royalty interests in oil and gas production obtained from tracts of land located in Wood County.[3] The tracts included a unit formation known as the Hawkins Field Unit (HFU).[4] Exxon is the unit's largest working interest owner, holding approximately 76% of the unitized production of the HFU. In addition, Exxon is the sole unit operator of the HFU, with the exclusive right to conduct unit operations.

As is customary in the oil and gas industry, Exxon and the plaintiffs entered into a lease agreement whereby the landowners would relinquish to the lessee, Exxon, the right to explore for and produce minerals from the property. In exchange, the landowners would receive ⅛th of the oil produced in their proportionate share of the unitized field, free of the cost of obtaining that production. This right to a cost-free share of the minerals actually produced is called a "royalty."[5] In exchange for payment based on the posted per barrel price, Exxon purchased plaintiffs' full royalty production interest, commencing January 1, 1975. Since that time, Exxon paid or tendered monthly payments for relevant volumes received, with the sum of each such payment based on the purchase price that Exxon itself posted for oil that originated in the plaintiffs' leases.

### Enter the DOE

On October 9, 1980, Exxon announced its intention to tender to interest owners sums less than the percentages owed based on posted prices. Exxon informed these interest owners that, beginning on or about November 20, 1980, through October 1981, Exxon would withhold significant amounts of sums owed to the interest owners. As justification for tendering less than the amount due, Exxon stated its desire to create a fund for payment of any liability it might have to the Department of Energy (DOE).

### The First Shots Are Fired

In June 1978, the DOE, without doubt the Hamlet of this piece, filed suit against Exxon, as operator of the HFU, contending that the HFU crude oil was overpriced in violation of DOE's petroleum price regulations.[6] This dispute between Exxon and the DOE arose out of changes in the permitted price structure for old and new oil. The DOE sued Exxon alone on the basis of the agency's newly created "operator liability" policy. Under that policy, the DOE proceeded against the unit operator, as op-

2. The case was removed by Exxon to Federal Court. *Jarvis Christian College v. Exxon Corp.*, Docket No. TY–80–432–CA.

3. For simplicity, the interest owners will be referred to throughout this opinion either as plaintiffs or as interest owners.

4. The HFU was approved for unitization by the Texas Railroad Commission on November 26, 1974. By agreement effective January 1, 1975, interest owners in the area unitized oil and gas rights pertaining to the unitized formation. The Unit Agreement embraces interests of approximately 2,200 royalty interest owners, who, with some 300 independent working interest owners, have an aggregate ownership of approximately 10% of the unit.

5. The unitization agreement was a separate agreement, which by law had to have the approval of the Texas Railroad Commission. *See* n. 4, *supra*. Under this agreement, minerals discovered anywhere in the formation, regardless of who owned the land above, was divided among the interest owners in proportion to their ownership in the land comprising the *unitized* formation.

6. The DOE filed suit against Exxon pursuant to the Economic Stabilization Act of 1970, 12 U.S. C. § 1904 note.

posed to the individual interest owners.[7] None of the Jarvis plaintiffs or any other interest owners, were parties to the DOE litigation.

While Exxon fought the good fight vigorously, at every turn, on every battlefield, the war was ultimately lost.[8] Judgment was entered in favor of the DOE, ordering Exxon, as operator of the HFU, to remit to the federal government all overcharges, plus interest, arising from sales of HFU crude oil for the period January 1, 1975 through January 27, 1981, in an amount exceeding $895 million.[9] With interest, following all appeals, the judgment exceeds $2 billion.

Exxon claims that more than $600 million of that $2.1 billion represents monies overpaid by Exxon to the plaintiffs and other HFU interest owners. Exxon seeks to recover their proportionate share of this judgment from the HFU interest owners.

### Chapter One: The Interest Owners on the Offensive

With that introduction, we now set the stage and introduce the cast of characters. Three different groups of HFU interest owners filed suit separately against Exxon in Tyler, Texas. All of these suits were filed before Exxon filed its first suit in the Southern District. In the first suit, *Jarvis Christian College*,[10] initially filed in state court on November 3, 1980, HFU interest owners contended that Exxon was required to pay to them the full amount of their royalty. Exxon removed the case to the United States District Court for the Eastern District of Texas, Tyler Division. This suit was prompted by Exxon's announced

intention to withhold a portion of the monthly royalty payments in an effort to build a repayment fund for the DOE litigation. After removal to the federal court, upwards of 150 owners of royalty interests in the HFU intervened as party plaintiffs.

On March 1, 1983, the Rutherford plaintiffs, seeking similar relief, first filed their suit against Exxon Corporation in Texas state court. Exxon removed the case to the Tyler Division.[11] On May 13, 1985, plaintiffs dismissed that suit without prejudice. On November 7, 1985, the Rutherford plaintiffs again filed suit against Exxon in that same state court. Exxon again removed the case to the Tyler Division.[12]

On June 30, 1986, the Beckett plaintiffs filed suit against Exxon in the Eastern District of Texas, Marshall Division.[13] These plaintiffs, apprehending that Exxon would seek reimbursement, sought a declaratory judgment preventing Exxon from recovering against them under the theory of contribution, or under any other theory which would allow Exxon to pass off its liability to the DOE. The *Beckett* suit also sought affirmative relief on two grounds (i) that Exxon negligently conducted the DOE litigation to the detriment and damage of these plaintiffs and (ii) that Exxon was guilty of fraud and breach of contractual obligations in willfully breaching the federal pricing regulations and falsely representing that the field was being operated in accordance with those regulations.

On July 1, 1987, in the Eastern District, Tyler Division, Texas, less than a month after Exxon's first suit was filed in the Southern District, the Rutherford plaintiffs filed a class action against Exxon, on be-

---

**7.** The interest owners, as best we can tell, in the aggregate own only 25% of the unit. *See* n. 3, *supra*. The District Court eventually found that Exxon, as operator of the field, had caused, and was fully liable for, the violations and restitution. This finding was affirmed on appeal, 773 F.2d 1240, 1272 (TECA 1985).

**8.** The District Court found that Exxon had violated the two-tiered oil price regulations established in 10 C.F.R. §§ 212.73, 212.74 (1975). *United States v. Exxon, Corp.*, 561 F.Supp. 816 (D.D.C.1983).

**9.** The District Court judgment was affirmed by TECA. *See United States v. Exxon Corp.*, 561

F.Supp. 816 (D.D.C.1983), *aff'd*, 773 F.2d 1240 (TECA 1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986).

**10.** *See* n. 2, *supra*.

**11.** *Rutherford v. Exxon*, Docket No. TY–83–142–CA.

**12.** *Rutherford v. Exxon*, Docket No. TY–85–462–CA.

**13.** *Beckett v. Exxon*, Docket No. M–86–74–CA.

half of all oil and gas royalty owners in HFU.[14]

### Chapter Two: Exxon Returns Fire In Houston

In an attempt to recover the $600 million that Exxon claims it is owed by HFU interest owners, Exxon reached settlements in 1,400 of the more than 2,300 HFU accounts. On June 5, 1987, in four virtually identical but separate actions,[15] Exxon, in the Southern District of Texas, sued four working interest owners in the HFU who were unwilling to reimburse Exxon for the overcharges.[16] Rather than seeking in any of the suits presently pending in both Tyler and Houston a defendant class certification, Exxon, in November 1987, filed an additional action in Houston, *Exxon v. First City National Bank of Austin*,[17] (the *Bank* suit) against 49 HFU interest owners who had not previously been named as defendants in the four earlier Houston suits. In that suit, Exxon requested certification of a defendant class.[18]

### Chapter Three: Tyler Orders a Cease Fire

Plaintiffs sought an order from the Tyler Court[19] prohibiting Exxon from prosecuting the *Bank* suit. On December 18, 1987, Judge Robert Parker granted the preliminary injunction, commanding Exxon to cease its prosecution of the *Bank* case in the Southern District and compelling Exxon to litigate the claims raised in that case in the Eastern District, Tyler Division.

On December 30, 1987, Judge Parker amended his previous injunctive order. The amended order allowed Exxon to assert any claims contained in the *Bank* litigation in the consolidated *Jarvis* cases pending in Tyler. Secondly, Exxon was permitted to file protective suits against Texas defendants in the pending Tyler litigation. Finally, the order granted Exxon permission to file protective suits against non-resident defendants in forums outside of Texas, so long as those suits were designated as protective suits. The order denied Exxon's request for a stay pending appeal.

Exxon filed notice of appeal on December 31, 1987. On January 20, 1988, this Court partially stayed Judge Parker's orders dated December 18, 1987 and December 30, 1987, pending resolution of those orders on appeal. The partial stay allowed Exxon to (i) serve with process any previously unserved person or entity which at that time was a specifically named defendant in any of the reimbursement lawsuits pending in the Southern District, Houston Division; (ii) defend in any of the Houston suits any actions initiated by an adverse party or by the court; (iii) file any compulsory counterclaim in a presently pending suit or in any present or future suit outside the State of Texas. The partial stay also (iv) prohibited the holding of hearings or issuance of orders by the Eastern District in the Houston suits and also prohibited the conducting of discovery in the Houston suits in the Eastern District.

**14.** *Rutherford v. Exxon,* Docket No. TY–87–270–CA.

**15.** *Exxon v. Phillips Petroleum Co.,* Docket No. H–87–1849–CA; (assigned to Judge Ross Sterling) *Exxon v. Fina Oil & Chemical Co.,* Docket No. H–87–1850–CA; (assigned to Judge James DeAnda) *Exxon v. Sun Exploration & Prod. Co.,* Docket No. H–87–2405–CA; (assigned to Judge James DeAnda) *Exxon v. Texaco,* Docket No. H–87–2718–CA (assigned to Judge Ross Sterling).

**16.** The agreements between Exxon and these four corporate working interest owners were similar to those with the royalty interest owners.

**17.** Docket No. H–87–3596–CA (assigned to Judge David Hittner).

**18.** The ostensible reason for this additional paper attack was that the arguably applicable two-year statute of limitations was ending, and Exxon had not yet settled its reimbursement claims against many of the HFU interest owners.

**19.** While Exxon contends Judge Ross Sterling, since deceased, the judge in front of whom the *Bank* case was pending, refused to transfer the reimbursement suits to Tyler, we can find no evidence in the record that a request for transfer was ever made, much less refused. Judge Sterling, with the approval of the judges assigned to the other four reimbursement claims, had previously consolidated all of these cases in his court.

On January 26, 1988, in the Eastern District (Tyler), Exxon filed suit against what appears to be every single owner of a royalty interest or mineral interest in the HFU, seeking reimbursement from these parties for monies which Exxon was required to pay to the DOE.[20]

### Chapter Four: A Flanking Movement

On February 1, 1988, Chief Judge Singleton of the Southern District of Texas signed an order which transferred all of the Houston reimbursement litigation, including the *Bank* case, to the Eastern District (Tyler).[21] On the surface, this essentially rendered the injunction appeal moot. Rather than conceding defeat, Exxon chose to continue the war, now on the battlefield of the Federal Rules of Civil Procedure and the propriety of the § 1404 transfer.

### The Fight is (Or Should Be) O'er

While the transfer order essentially accomplished everything that could have been accomplished on appeal of the injunction, Exxon objected to the dismissal of this appeal for mootness on the grounds that the transfer order was improper. A § 1404 transfer order is an interlocutory order from which an appeal does not generally lie. In this situation, however, the validity of the transfer order was critical to the issue of mootness. If the transfer order was invalid, then the injunction appeal would remain viable. Consequently, this court requested supplemental briefs and oral argument on the question of mootness and on the validity of the transfer order.

Exxon's basic premise is that the transfer order is invalid because it was issued *sua sponte* by Chief Judge Singleton, without notice or a hearing. There is also a vague contention that this court had accepted jurisdiction over the venue issue, thus taking the matter out of Judge Singleton's hands. We reject both of these contentions. In the first place, this court had no jurisdiction over the suits then pending in the Southern District, therefore Judge Singleton was vested with the authority to issue the transfer order.

In the second place, while generally a hearing is desirable the lack thereof does not indicate the invalidity of the subsequent order. Section 1404 transfers are authorized "[f]or the convenience of parties and witnesses, in the interest of justice...." Decisions to effect a 1404 transfer are committed to the sound discretion of the transferring judge,[22] and review of a transfer is limited to abuse of that discretion. Exxon has not pointed this Court to a single acceptable reason to support their assertion that the transfer was an abuse of Chief Judge Singleton's discretion. This case is not being consigned to the wastelands of Siberia or some remote, distant area of the Continental United States. The minor inconvenience Exxon may suffer in having to litigate this case in Tyler—only 203 miles distant—rather than in Houston, can in no rational way support the notion of abuse of discretion.

There are no genuine issues of material fact which Judge Singleton, the transferring Judge, could not legally determine regarding the proper forum in this case. Two federal district court judges in Houston and Tyler have reviewed these cases and the facts critical to the issue of the place of trial. Those judges are in agreement—Judge Parker by his initial injunctive order and Judge Singleton by his 1404 transfer order—and these appellate judges can find no abuse of discretion in the determination that the proper forum for this litigation is the Eastern District, Tyler Division.

Judge Parker and Judge Singleton in their respective actions concur that this

---

**20.** *Exxon v. Arnold,* et al., Docket No. TY-88-110-CA.

**21.** All of the cases were physically transferred on February 1, 1988, with no action having been taken by the Southern District Court on Exxon's motion to reconsider.

**22.** *Weber v. Coney,* 642 F.2d 91 (5th Cir.1981); *Garner v. Wolfinbarger,* 433 F.2d 117 (5th Cir. 1970); *In re Ralston Purina Co.,* 726 F.2d 1002 (4th Cir.1984); *Arkla Exploration v. Texas Oil & Gas Corp.,* 734 F.2d 347 (8th Cir.1984); *Roofing and Sheet Metal Serv. v. LaQuinta Motor Inns,* 689 F.2d 982 (11th Cir.1982).

case is better handled in Tyler where the majority of the interest owners reside than in Houston. The cases filed in Houston involve issues either identical, or substantially related, to the issues pending before the Eastern District. The HFU is located entirely within the Eastern District. Judge Singleton additionally found that the small interest holders would suffer undue hardship if forced to litigate in the Southern District.[23] Finally, the *Jarvis* case was the first of all these suits filed. Judge Singleton, in exercising his discretion, gave ample justification for transferring these suits to the Eastern District, Tyler Division. We perceive no abuse of discretion.

### To the Victors Go the Spoils

The plaintiffs have requested treble costs and fees against Exxon as a sanction for pursuing a frivolous appeal. We cannot say that Exxon's appeal has been patently frivolous. The appeal from the initial injunction, although mooted by the valid 1404 transfer and thus not reached on the merits, was certainly colorable. Although our research has failed to uncover a single case in this circuit which supports a reversal of Judge Singleton's order on abuse of discretion grounds, concerns over the effect of the 1404 order and the mootness of the main appeal warranted continued advocacy. We decline to award attorneys' fees or added costs.

AFFIRMED.

23. In addition to being less convenient for these individual lease owners, the Houston court presently has one of the heaviest case loads of any District Court in the country. Given this factor outside the control of the litigants, it is extremely likely that the the interests of justice will be more rapidly served in Tyler.