UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-8280
_____

FRED McKETHAN,

Plaintiff-Appellant,

VERSUS

TEXAS FARM BUREAU, and
Affiliated Companies, Including
its Subsidiaries and Subdivisions, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

July 19, 1993

Before POLITZ, Chief Judge, REAVLEY and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

This appeal centers on whether cutting comments by the presenter at an awards ceremony to one of the recipients, Fred McKethan, can be the basis for age discrimination, intentional infliction of emotional distress, and slander. McKethan contests adverse judgments on those claims, rendered by the district court following his jury trial case-in-chief. In addition, he challenges a number of other rulings and actions by the court, as well as the denial of his Rule 60(b) motion for recusal, disqualification, and a new trial. Because we agree with the disposition of the claims, and conclude that the district court did not abuse its discretion,

we **AFFIRM**.  And, because McKethan failed to file a notice of appeal from the Rule 60(b) ruling, it is not subject to review.

I.

Texas Farm Bureau (TFB), *inter alia*, assists in providing insurance coverage to its membership families.  To that end, it affiliates with several insurance companies, which employ "career agents" to market and service a variety of products.  Texas counties are organized by sales districts; and each is supervised by a district sales manager, who is an employee of TFB and is compensated with, *inter alia*, a base salary plus commission, bonuses, and retirement benefits.  The district managers have a variety of responsibilities, including the supervision of agency managers[1] and career agents within the district, and the recruitment and training of new agents.

Employed by TFB in 1971 as a career agent, McKethan became a district sales manager in 1973, and held that position throughout his career.  He was often recognized for outstanding work.  In all but one year, he won "the Top 10 jacket"; and, in his 20 years with TFB, he never failed to win the "All-Star and Roundtable Trip" awards.

In May 1990, TFB held its annual statewide agents' meeting in San Antonio.  Approximately 700 people were in attendance, including agents, agency managers, all 14 district managers (including McKethan), the two regional sales managers, (Paul

---

[1]    Agency managers supervise career agents and also sell insurance.  Like the career agents, they are under contract with the various insurance agencies on a commission basis.

Lancaster and Don Grantham), two associate state sales managers, and the state sales manager (Robert Peacock).

The following represents McKethan's version of what transpired during the awards ceremony, at which Lancaster and Grantham introduced recipients. McKethan had received positive recognition at 17 consecutive banquets. When his turn for recognition came, Grantham told him to stand up, but then said, "[s]it down, you don't have anything, you haven't done anything to be recognized for"; that McKethan "never had a master agent and never would have one".[2] The remarks lasted approximately one to two minutes; McKethan "felt like [he] had been poleaxed with a four-by-four". For the remainder of the evening, he had a characteristic "red stripe" in the middle of his forehead, which appears when he becomes angry. At the close of the program, Randy Grantham, an employee in McKethan's district and Don Grantham's son, approached McKethan and said, "I went to Dad and told him, `Congratulations, Dad, you've just ruined my career with Farm Bureau Insurance Company'". McKethan then located Don Grantham, picked him up, and stated, without laughter, "I ought to kill you".[3]

---

[2] A master agent is "a young man or woman that's done an outstanding job".

[3] As stated, the foregoing represents McKethan's version, which we accept as true in view of the procedural posture of this case. *See infra*. According to Grantham and Peacock, Grantham asked McKethan to stand up, and, while he was nervously looking for McKethan's listing (he had never addressed a crowd that large), stated "Fred, it doesn't look like you did anything"? He then found McKethan's name, stated "Fred, I was just kidding", and announced McKethan's accomplishments. He testified that his comments lasted two or three seconds, and that he said nothing about master agents. Regarding McKethan's confrontation with

That night, McKethan played poker for one hour, and then went to bed.  When he awoke, he "was upset terribly"; "[he] felt ... they had effectively destroyed [his] credibility with home office people, with [his] district, with [his] life".  He called his immediate supervisor, Lancaster, and told him that he was ill; that he had been to the bathroom seven times with an upset stomach; that he "couldn't face the agents"; and that he was returning home.  He conveyed the same information to Peacock, who called a few minutes later; but Peacock did not apologize or otherwise respond.  Accordingly, McKethan left the meeting.

A day or two later, Lancaster left a message on McKethan's answering machine, stating, "[s]orry that happened in San Antonio, hope you're feeling better, and you're the best district manager I have in the south".  Grantham did not apologize.  He testified that Peacock told him that he did not think an apology was necessary.  Nor did McKethan request one.

Approximately two weeks after the meeting, McKethan told Lancaster that he intended to retire in 13 months (July 1, 1991).  He hoped to wait that long for tax reasons.  Neither Lancaster nor any other TFB official attempted to persuade him to stay.

In February 1991, McKethan filed an age discrimination charge with the Equal Employment Opportunity Commission (EEOC), pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §

---

Grantham, Peacock testified that McKethan put his arm around Grantham's neck, and, with laughter, stated, "I loved it, you son of a bitch, I ought to kill you".

4

621, *et. seq.*, claiming that the awards incident constituted constructive discharge. He was approximately 58 years old.

McKethan's attorney advised TFB that March that he represented McKethan both in his age discrimination claim and in his slander and intentional infliction of emotional distress claims, and that unless the matter was resolved, suit would be filed in late April. TFB responded by denying McKethan's allegations. It did not apologize for the awards incident or ask McKethan to reconsider his decision to retire.

McKethan, by letter to Peacock that May, requested an excused absence from the statewide meeting because of the comments made the year before.[4] He warned that, given this stress, his doctor had advised him not to attend, and if required to do so, he would "seek compensation" for any stress-induced harm.

Peacock excused McKethan from attending the meeting, noting by letter that he was "unaware" that McKethan was under a physician's care, and remarking, "I still can't understand your reaction to last year's meeting". In addition, he advised that he intended to select McKethan's replacement soon (he was conducting the search),

---

[4] His letter stated:

> I cannot forget that the statewide meeting last year was where everything fell apart -- where I was subjected to ridicule in front of everyone. Nothing on earth can undo what was done, and it would be grossly demeaning for me to attend, and I am hoping and requesting that you spare me from this experience. Please understand that in view of what happened, nothing that is said or not said at this meeting can undo the harm that was done.

and thanked him for "offering to introduce your replacement to the people in your district prior to your retirement on July 1st".

Also in May, McKethan filed suit for discharge (constructive) on the basis of age, in violation of the ADEA, with a supplemental slander claim.[5]  The defendants answered that, "[w]ith regard to reinstatement, ... it is not necessary, as [McKethan] is still an employee of Defendants, and his continued employment is workable and feasible.  ... [McKethan] can continue to work as a district sales manager for TFB".

McKethan retired in July, as planned.  Two months later, an amended answer included the above quoted statement.  Shortly after reviewing it, McKethan wrote to Peacock, accepting "the invitation ... to continue working as a District Sales Manager".  He explained, "[a]lthough I have great misgivings because of all that has happened ... I cannot stand being unemployed ....."  He requested, *inter alia*, that TFB notify those in attendance at the meeting that Grantham's comments were not intended to be derogatory; that Grantham be asked to apologize; and that TFB reimburse him for lost wages.  However, he did not condition his return on those requests.  In closing, McKethan stated, "[w]hile I can never forget what happened to me ... I am prepared to forgive, and under these circumstances I am anxious to get back to work immediately".

---

[5]    In January 1992, McKethan added supplemental claims for intentional and negligent infliction of emotional distress.

TFB responded by denying McKethan's reinstatement request, stating that the position had been filled following his retirement. It explained that at the time of its original answer, McKethan was still employed, and that had he requested to stay prior to his retirement, his request would have been honored. TFB's attorney apologized for his failure to omit the continued employment offer from the amended answer.

In April 1992, the defendants' summary judgment motion was denied, and, a few days later, a jury trial held. At the close of McKethan's evidence, TFB and Grantham moved successfully on the age discrimination and emotional distress claims for a directed verdict (pursuant to 1991 amendments to Fed. R. Civ. P. 50, now "judgment as a matter of law"). In addition, the court *sua sponte* reconsidered, and granted, summary judgment on the slander claim.[6] Judgment was entered on April 25; McKethan timely appealed on May 21.

On June 1, 1992, McKethan filed a motion to recuse, disqualify, and for a new trial, based upon an *ex parte* contact in January 1992, reflected in defendants' post-trial motion for attorney's fees. The motion was transferred to another judge, who denied it. McKethan did not file a notice of appeal from this order.

---

[6]    As stated in *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), "because the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law".

II.

McKethan challenges discovery and procedural rulings and other actions by the district court, the judgments on his substantive claims, and the denial of his post-trial motion.

A.

McKethan agrees that our standard of review for the contested discovery and procedural rulings and actions is abuse of discretion. *See **United States v. Doucette***, 979 F.2d 1042, 1044 (5th Cir. 1992); ***Mills v. Beech Aircraft Corp.***, 886 F.2d 758, 761 (5th Cir. 1989); ***Fontenot v. Upjohn Co.***, 780 F.2d 1190, 1193 (5th Cir. 1986). Primarily at issue is the denial of his untimely motion to change the trial location and date.[7]

McKethan filed suit in the Western District of Texas, Austin Division, on May 1, 1991. That July, Judge James R. Nowlin reassigned the case to Judge Walter S. Smith, Jr. On August 2, trial was set for December 16 in Austin; on October 2, it was reset for March 16, 1992. In response to TFB's agreed motion for a continuance, Judge Smith on December 17 reset trial for April 20,

---

[7] McKethan also maintains that the court abused its discretion in refusing, prior to trial, to compel TFB to answer discovery regarding its employment of blacks and females. McKethan asserts that it was needed to impeach Peacock's deposition testimony, likely to be reiterated at trial, regarding TFB's employment practices, thus calling into question the credibility of TFB's denial of age discrimination. Because we hold *infra* that the court concluded properly that McKethan failed to raise a fact issue on constructive discharge, irrespective of TFB's intent to discriminate, we need not address this issue.

In addition, McKethan contends that the court abused its discretion by expressing frustration with McKethan's counsel in the presence of the jury, and by curtailing cross-examination. We disagree; the error, if any, was harmless.

8

1992, and, *sua sponte*, moved it to the Waco division of the district.[8]

On January 14, 1992, Judge Smith transferred approximately 90 cases, including this one, to Judge Sam Sparks. On January 16, he took back seven, including this one, and assigned Judge Sparks four others.[9]

---

[8] McKethan does not contest the court's discretion to transfer the trial to a different division within the district. Instead, as noted, he contends that the transfer and subsequent refusal to grant a continuance constitute an abuse of discretion.

In addition, he maintains for the first time on appeal that the court reversibly erred by transferring venue without affording him notice and an opportunity to be heard. TFB counters that Judge Smith did not transfer venue; rather, he provided notice of a "special session", pursuant to 28 U.S.C. § 141, which states:

> Special sessions of the district court may be held at such places in the district as the nature of the business may require, and upon such notice as the court orders.
>
> Any business may be transacted at a special session which might be transacted at a regular session.

This circuit has not analyzed the discretionary powers arising from § 141; and, we refrain from doing so here because, even accepting McKethan's characterization of the order as a transfer of venue under 28 U.S.C. § 1404, our failure to review his untimely procedural contention will not result in plain error. As we stated in *Jarvis Christian College v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988), "while generally a hearing is desirable the lack thereof does not indicate the invalidity of the subsequent order". Moreover, McKethan had notice, four months before trial, that it would be held in Waco. Although he had ample opportunity to timely object, he failed to do so. *See infra*.

[9] Judge Sparks on January 16 granted McKethan leave to file an amended complaint. McKethan maintains that the court reversibly erred by reassigning the case to its docket after Judge Sparks had exercised "jurisdiction" over it. Even assuming this contention has any merit, McKethan failed to sufficiently brief it; accordingly, we consider it waived. *See* Fed. R. App. P. 28(a)(5) ("[t]he argument shall contain the contentions of the appellant

TFB received a copy of the January 16 reassignment order; McKethan's counsel maintains that he did not. On April 8, 1992, McKethan filed a motion for trial to be held in Austin, and for a continuance, in which he objected to the earlier transfer to Waco. As explanation for his belated filing, counsel stated that he had not received the order reassigning the case to Judge Smith; accordingly, he was unaware that the case remained scheduled for trial on April 20 in Waco until April 7, when he spoke with one of Judge Smith's law clerks by telephone.[10] The court denied this motion, stating that "a transfer of this case to the Austin Division at this late date would be highly prejudicial".

McKethan seeks a new trial, asserting that the district court abused its discretion in refusing to reset the trial's location and date.[11] We disagree. The court acted within its discretion in

---

with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on"); **Marple v. Kurzweg**, 902 F.2d 397, 399 n.2 (5th Cir. 1990).

[10] He added in his subsequent motion for a new trial that when Judge Smith first set the case for trial in Waco, he "immediately contacted Judge Smith's law clerk who advised a motion to have the matter returned to Austin for trial would not be needed because the case was being reassigned for trial in Austin to the docket of Judge Sam Sparks".

While we recognize that some courts permit communications with law clerks, they are not a substitute for the requisite papers to be filed with the court and notice or other response from it. This is especially true when, as here, the subject of the communication is a basis for an issue on appeal. The numerous and fundamental reasons for this are most obvious.

[11] For purposes of this case, we treat McKethan's motion to reset as a request to transfer venue, pursuant to 28 U.S.C. § 1404(a). See supra note 8. As discussed in note 8, McKethan does not maintain that the court lacked discretion to transfer the trial to

ruling that McKethan's motion, filed over four months after notice and approximately ten days before trial, was far too late in the day. As hereinafter discussed, the explanation for the belated filing, based upon counsel's claimed failure to receive the reassignment order, is quite unavailing.

First, and most important, Judge Smith's December 17 order set the trial's location and date. Counsel received no notice that either changed with transfer of the case to Judge Sparks. Rather, counsel's confusion stemmed from his misplaced assumption, discussed in note 10, *supra*, that the assignment to Judge Sparks nullified the location and date. He proceeded for over four months of discovery and pretrial motions without inquiring into an amended setting.[12] Simply because counsel did not receive the reassignment order does not excuse his decision to assume, without notice from the court, that the setting had been changed.

Moreover, the record contradicts counsel's purported lack of knowledge. On February 3, Judge Smith, not Judge Sparks, signed an order granting McKethan's motion for an extension of time to reply to TFB's summary judgment motion. And, on February 14, TFB and McKethan filed a joint motion, requesting an extension of time to file the pretrial order because "the case was reset for April 20, 1992, in Waco, Texas".[13] The pretrial order, filed on March 24,

---

Waco.

[12] Of course, we refuse to consider his claimed reliance on a conversation with a law clerk. See note 10, *supra.*

[13] TFB's counsel signed the motion and certified that McKethan's counsel desired to join. In addition, the certificate of service

approximately one month prior to the trial date, was signed by McKethan's counsel. It referred to Judge Smith as presiding, and specified April 20 as the trial date. Thus, at a minimum, one month before the trial date, counsel was aware of it, and the reassignment to Judge Smith.[14] The court did not abuse its discretion in denying McKethan's motion for a new setting.

B.

McKethan maintains that the district court erred in granting judgment as a matter of law on his age discrimination and intentional infliction of emotional distress claims,[15] and in granting summary judgment on his slander claim.

Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c). We apply the same standard of review as did the district court, *Hamilton v. Grocers Supply Co.*, 986 F.2d 97, 98 (5th Cir. 1993), drawing all inferences most favorable to the non-moving party. *Id.* "The mere existence of a scintilla of evidence

_____

stated that a copy had been sent by certified mail to McKethan's counsel.

[14] Counsel's contention in his reply brief that the pretrial order did not so inform, because it "was submitted by [his] associate" is totally without merit. In fact, it is almost, if not completely, astonishing that such an assertion would be made. Needless to say, that another lawyer in counsel's firm may have prepared and submitted the pretrial order is immaterial; obviously, that knowledge is imputed to him.

[15] In his reply brief, McKethan withdrew his negligent infliction of emotional distress claim in light of *Boyles v. Kerr*, 1993 Tex. LEXIS 58, 36 Tex. Sup. Ct. J. 874 (Tex. May 5, 1993), which held that Texas does not recognize that tort.

12

in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The foregoing standard also applies to our review of judgments as a matter of law. Fed. R. Civ. P. 50(a)(1); *Barnett v. I.R.S.*, 988 F.2d 1449, 1452 n.5, 1453 (5th Cir. 1993).[16]

1.

For his age discrimination claim, McKethan must prove, *inter alia*, his asserted constructive discharge. "The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir. 1990) (internal quotations omitted). The test is that of a "reasonable-employee"; that is, "were [the working conditions] so difficult or unpleasant that [a] reasonable person in [McKethan's] shoes would

---

[16]    The Rule provides in part:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).

13

have felt compelled to resign". *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 242 (5th Cir. 1993).

First, we emphasize that none of the usual factors present in a constructive discharge case are before us. It is undisputed that McKethan was not demoted; he was not asked to perform duties inconsistent with, or more onerous than, other TFB district sales managers; and TFB did not reduce his compensation.[17] Moreover, the record is devoid of evidence indicating that the awards incident diminished his reputation. McKethan testified that he knew of no one whose opinion of him changed, and his agents performed better during the months following the incident than they had in the previous two years. Accordingly, his characterization of his working conditions as intolerable was based only on the embarrassment caused by the incident, TFB's failure to initiate a proper apology,[18] and otherwise dissuade him from retiring, and his inferences that the foregoing reflected TFB's desire to replace him with a younger person. Based on the evidence, a reasonable jury could not find constructive discharge.

Even if Grantham's remarks were, as McKethan alleges, the first step of a scheme to force him to retire because of his age, a reasonable person would not have felt compelled to resign based on that incident alone; rather, he would have demanded an apology

---

[17]   Rather, in the three years preceding his departure, his income increased from $69,346.40 in 1988 to $83,956.96 in 1990.

[18]   As stated *supra*, Lancaster, McKethan's direct supervisor, apologized a day or two after the incident; but, according to McKethan, Lancaster's message "[did] not constitute an apology".

14

or otherwise attempted resolution within TFB, and, if necessary, filed an age discrimination claim with the EEOC while employed. See *Ugalde*, 990 F.2d at 243.[19]  We conclude that McKethan's working conditions were more than sufficiently conducive to an attempt to resolve his grievances.[20]  Our conclusion is buttressed by the fact that McKethan voluntarily delayed retirement for 13 months for tax benefits, and that, subsequent to retirement, requested his job back.

McKethan may have felt humiliated; but, the standard is an objective one.  And, as stated, viewing all inferences in McKethan's favor, we conclude that a reasonable employee would not have felt compelled to resign.  Accordingly, the district court properly granted judgment against McKethan on his age discrimination claim.

---

[19]    In *Ugalde*, one supervisor referred to Ugalde and other Hispanic employees as "Mexicans" and "wetbacks".  When Ugalde was not immediately given a chance to meet with the head of the company to voice his complaints, he walked off the job.  We affirmed the summary judgment because, under the circumstances presented in the case, "a reasonable employee instead of resigning would first have pursued either or both of two courses - completed the internal grievance procedure, or filed a complaint with the EEOC".  *Id.* (quoting *Bozé*, 912 F.2d at 805).

[20]    For example, Peacock testified that in June 1990, following the incident in May, he and McKethan played golf together and socialized for over four hours; during that time, McKethan did not express bitterness about either his decision to retire or the incident.  According to Peacock, the same occurred when they played golf together in October of that year.  McKethan does not dispute this testimony.

McKethan's intentional infliction of emotional distress claim was based on the awards incident, TFB's failure to take corrective action, and TFB's retraction of the continued employment offer contained in its amended answer. Of course, we apply Texas law to this claim and his other supplemental claim for slander, discussed in part II.B.3. *See* **Wilson v. Monarch Paper Co.**, 939 F.2d 1138, 1142 (5th Cir. 1991).

The Texas Supreme Court has recently adopted the tort of intentional infliction of emotional distress, as stated in § 46(1) of the Restatement (Second) of Torts (1965). *See* **Twyman v. Twyman**, 1993 Tex. LEXIS 59, 36 Tex. Sup. Ct. J. 827 (Tex. May 5, 1993).[21] Accordingly, in order to recover for intentional infliction of emotional distress, McKethan must establish that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was

---

[21] The court explained:

> As distinguished from the tort of negligent infliction of emotional distress, we believe the rigorous legal standards of the Restatement formulation of intentional infliction of emotional distress help to assure a meaningful delineation between inadvertence and intentionally or recklessly outrageous misconduct. The requirements of intent, extreme or outrageous conduct, and severe emotional distress before liability can be established will, we think, strike a proper balance between diverse interests in a free society. That balance, at minimum, must allow freedom of individual action while providing reasonable opportunity for redress for victims of conduct that is determined to be utterly intolerable in a civilized community.

*Id.* at ** 5-6.

extreme and outrageous; (3) the defendant's actions caused him emotional distress; and (4) the emotional distress was severe. *Id.* at ** 3-4. "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Wornick Co. v. Casas*, 1993 Tex. LEXIS 102, * 7 (Tex. June 30, 1993) (internal quotations omitted).

In *Wornick Co.*, the plaintiff was unexpectedly fired, even though she had received favorable job-performance reviews; was told to leave the premises immediately; and was met by a security guard instructed to escort her off the premises. The guard waited while she spoke with the president of the company, who promised that she would be on a leave of absence, rather than terminated, pending a meeting. Despite this promise, the plaintiff was removed from the payroll shortly thereafter and not allowed to return to the premises; no meeting was scheduled. *Id.* at ** 2-5.

The Texas Supreme Court held that although this conduct "could reasonably be expected to cause humiliation ... [it] did not `exceed all possible bounds of decency' and was not `utterly intolerable in a civilized community'". *Id.* at * 8. The court emphasized that to hold otherwise would wholly undermine the employment at will doctrine by subjecting employers to "a potential

17

jury trial in connection with virtually every discharge".[22] *Id.* at
* 12.

The conduct at issue is less extreme than that in *Wornick Co.*
Grantham's remarks were brief and, at worst, conveyed the message
that McKethan had not earned recognition; by contrast, the
termination in *Wornick Co.* implied incompetence or misbehavior. As
for the failure to delete the offer of continued employment from
the amended answer, this conduct, even if intentional, is not
meaningfully distinguishable from the president's conduct in
*Wornick Co.*[23]

In addition, McKethan failed to provide evidence that his
distress was severe. The Texas Supreme Court has not yet analyzed
the severity requirement; however, quoting the Restatement (Second)
of Torts § 46 comment j (1965), the Texas Court of Appeals has held
that in order to create a jury issue on liability, the plaintiff
must present evidence that his distress was so severe that "no
reasonable man could be expected to endure it". *K.B. v. N.B.*, 811
S.W.2d 634, 640 (Tex. App.-San Antonio 1991, writ denied), *cert.
denied*, ___ U.S. ___, 112 S. Ct. 1963 (1992). McKethan failed to

---

[22]    Our decisions prior to the recent Texas Supreme Court
decisions compel the same result. We held that an "ordinary
employment dispute" rises to the level of "outrageous" conduct
under Texas law where there is evidence of intentional and
systematic degradation and humiliation, *Wilson*, 939 F.2d at 1145,
or reprehensible conduct that is "utterly intolerable in a
civilized community". *Dean v. Ford Motor Credit Co.*, 885 F.2d 300,
306-07 (5th Cir. 1989).

[23]    Accordingly, we need not consider TFB's assertion that
litigants' allegations are absolutely privileged in infliction of
emotional distress cases.

meet this burden.  Aside from his testimony about stomach problems on the day of, and after, the incident, the only other possible evidence of severe distress is his conclusory testimony regarding his self-diagnosed depression.

In view of the foregoing, the district court correctly refused to allow the jury to consider McKethan's claim for intentional infliction of emotional distress.

3.

McKethan maintains that the court erred in disposing of his slander claim by *sua sponte* granting, on reconsideration, TFB's summary judgment motion.  "Slander is a defamatory statement orally communicated or published to a third person without legal excuse".  ***Ramos v. Henry C. Beck Co.***, 711 S.W.2d 331, 333 (Tex. App.-Dallas 1986, no writ).  "A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury." ***Einhorn v. LaChance***, 823 S.W.2d 405, 410-11 (Tex. App.-Houston 1992, writ dism'd w.o.j.).

"Whether the words are reasonably capable of the defamatory meaning the plaintiff attributes to them is a question of law for the trial court".  ***Kelly v. Diocese of Corpus Christi***, 832 S.W.2d 88, 91 (Tex. App.-Corpus Christi 1992, writ dism'd w.o.j.).  To that end, "[t]he allegedly slanderous statements must be construed as a whole, in light of the surrounding circumstances or context in which a person of ordinary intelligence would understand the statements".  ***Shearson Lehman Hutton, Inc. v. Tucker***, 806 S.W.2d 914, 920-21 (Tex. App.-Corpus Christi 1991, writ dism'd w.o.j.).

19

The district court concluded: "[a]ssuming that [McKethan's] testimony as to the statements made by Don Grantham is true, those statements, taken in the *undisputed* context of their making are not slanderous, and no reasonable jury could so find". (Emphasis in original.) We agree.

As noted, Grantham's remarks were made at a ceremony recognizing top performance. McKethan agreed that "traditionally and over the years, there had always been at least teasing and laughter". Grantham and Lancaster were at the podium to announce the "top ten in the company" for region one and two. McKethan's name was ninth on the list for region two. Rather than read McKethan's accomplishments, Grantham stated (McKethan's version): "Sit down, you don't have anything, you haven't done anything to be recognized for ... [you] never had a master agent and never will have one". According to all witnesses at trial, except McKethan, at least part of the crowd reacted with laughter.[24]

McKethan's name was listed prominently in the program as a moderator for two panel discussions earlier that day. He had been recognized at 17 consecutive banquets. And, according to testimony, he was widely regarded as one of the best district sales managers in the state. Considering the context of a jovial recognition ceremony, the nature of the remarks, and McKethan's prominence as an exceptional district sales manager, we conclude that a person of ordinary intelligence would not have attributed a defamatory meaning to the remarks.

---

[24] McKethan does not dispute this testimony.

20

C.

McKethan maintains that the court erred in denying his Rule 60(b) motion for recusal, disqualification and a new trial,[25] pursuant to 28 U.S.C. §§ 144, 455.[26] The motion was triggered by TFB's disclosure in its motion for attorney's fees, subsequent to entry of judgment, of an *ex parte* telephone conversation between Judge Smith and a lawyer with the firm representing TFB (Judge

---

[25] As McKethan agrees, because the motion was filed more than ten days after judgment, we consider it a Rule 60(b) motion. *See* **Harcon Barge Co. v. D & G Boat Rentals, Inc.**, 784 F.2d 665 (5th Cir.), *cert. denied sub nom.*, **Southern Pacific Transp. Co. v. Harcon Barge Co.**, 479 U.S. 930 (1986).

[26] Section 144 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Section 455(a) provides:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

21

Smith's former firm).[27]  That lawyer, in response to McKethan's motion, confirmed by affidavit that he contacted Judge Smith on January 17, 1992, to alert him that Judge Sparks, to whom the case had been transferred on January 14, would be biased in TFB's favor because he formerly represented it.

Judge Smith transferred the motion to Judge H. F. Garcia.  In the transfer order, Judge Smith explained that he took the call because it was from a friend of many years and that he responded to the inquiry by stating that he had not intended to transfer the case, and that an amended order had already been filed.[28]

Judge Garcia allowed McKethan additional time to file an extended reply to Judge Smith's order and TFB's response to the motion.  He subsequently denied the motion.  McKethan did not file a notice of appeal from that ruling.

1.

McKethan urges that we review the denial of his Rule 60(b) motion, even though he failed to file a notice of appeal from it. We disagree.  McKethan failed to preserve for appellate review the recusal issue raised in his Rule 60(b) motion, because he did not separately appeal from the ruling on it.  *See **Ingraham v. United States***, 808 F.2d 1075, 1081 (5th Cir. 1987) ("where a 60(b) motion is filed after the appeal is noticed, an appeal from the ruling on

---

[27]    The conversation was one of the time entries in fee statements attached to TFB's motion.

[28]    The order transferring the case back to Judge Smith was, in fact, signed on January 16, the day before the conversation, although it was not filed until January 21.

that motion must be separately taken if the issue raised in that motion is to be preserved for appeal").[29]  Accordingly, the Rule 60(b) motion is not before us.

2.

In the alternative, McKethan asserts that, because he filed a notice of appeal from the underlying judgment, we should review, as if presented for the first time on appeal, Judge Smith's failure to recuse or disqualify himself.[30]  Although it may indeed be within our power to do so, we refuse to countenance this attempt to circumvent the requirements discussed *supra*.[31]  This issue was not raised for the first time on appeal -- far from it.  McKethan fully presented it in his Rule 60(b) motion; both parties extensively briefed and otherwise presented it; and the district court gave it careful consideration, concluding it was without merit.  We will

---

[29]    This court focused on the fact that denial of a Rule 60(b) motion is separately appealable, even where, as here, appeal from the underlying judgment is pending.

[30]    According to McKethan, Judge Smith's *ex parte* conversation, along with his conduct at trial, severely comprised his appearance of impartiality.

[31]    This circuit has not yet clearly defined the scope of our review of § 455 issues raised for the first time on appeal.  In **United States v. York**, 888 F.2d 1050, 1055-56 (5th Cir. 1989), we suggested that the Supreme Court has at least implicitly rejected a *per se* rule deeming untimely all § 455 motions raised for the first time on appeal.  **Id.**  The **York** panel therefore refused to apply "an inflexible rule", but concluded that the motion was untimely based upon the facts and circumstances.  **Id.**  In addition, we noted that regardless of timeliness, some courts apply the plain-error rule, which requires a showing of "particularly egregious errors" resulting in a "miscarriage of justice".  **Id.** (internal quotations omitted).  Without deciding whether untimeliness may be disregarded where there is plain error, we held that appellant failed to establish plain error.  **Id.**

not participate in the fiction that the issue was not raised in district court simply because McKethan failed to comply with the prerequisites to review.  Accordingly, we reiterate that the issue is not properly before us.

## III.

For the foregoing reasons, the judgment is

**AFFIRMED**.